**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAY HECKELMANN,** | : | **CIVIL ACTION NO. 3:13-CV-00175** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **vs.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

**<u>Background</u>**

The above-captioned action seeks review of a decision of the Commissioner

of Social Security ("Commissioner") denying Plaintiff Jay Heckelmann's claim for

social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes.  The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured."  It is undisputed that

Heckelmann met the insured status requirements of the Social Security Act

through December 31, 2010.  Tr. 21, 23 and 166.[1]  In order to establish entitlement to

disability insurance benefits Heckelmann was required to establish that he suffered

---

[1]References to "Tr.__" are to pages of the administrative record filed by the
Defendant as part of the Answer on March 29, 2013.

from a disability on or before December 31, 2010.  42 U.S.C. §423(a)(1)(A), (c)(1)(B);

20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Heckelmann protectively filed[2] his application for disability insurance

benefits on November 30, 2009. Tr. 21, 95, 118-119, 127 and 166.  On May 25, 2010,

the Bureau of Disability  Determination[3] denied Heckelmann's application. Tr. 98-

102.  On June 29, 2010, Heckelmann filed a request for a hearing before an

administrative law judge. Tr. 107.  The request was granted and a hearing was held

on May 16, 2011. Tr. 44-94.  Heckelmann was represented by counsel at the hearing.

Id.  On July 19, 2011, the administrative law judge issued a decision denying

Heckelmann's application. Tr. 21-30.  The administrative law judge found that

Heckelman failed to prove that he met the requirements of a listed impairment or

suffered from work-preclusive functional limitations. Id.  The administrative law

judge concluded that Heckelmann had the ability to engage in a limited range of

sedentary work. Id.  On August 25, 2011, Heckelmann filed a request for review with

the Appeals Council.  Tr. 16-17.  On November 28, 2012, the Appeals Council

concluded that there was no basis upon which to grant Heckelmann's request for

---

[2]A protective filing occurs when an individual initially contacts the Social Security Administration to file a claim for benefits and requests an expedited filing date. Simply stated, it allows an individual to have an application date based upon the date of his or her first contact with the Administration.

[3]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.  Tr. 99.

review. Tr. 1-4.  Heckelmann filed the instant complaint in this court on January 24, 2013.

Heckelmann  was born in the United States on April 19, 1978, and at all times relevant to this matter was considered a "younger individual"[4] whose age would not significantly impact his ability to adjust to other work. 20 C.F.R. § 404.1563©; Tr. 48, 95, 118 and 127.  Although Heckelmann had difficulties during his elementary and secondary education and withdrew from school in or about 1996 during the 11th grade, he can read, write, and converse in English and perform basic mathematical functions. Tr.  133, 172-220 and 325-342.  His intellectual functioning was reported to be in the average range and after withdrawing from school his employment history included skilled work. Tr. 84 and 220.

Heckelmann's work history covers 10 years and at least 5 different employers. Tr. 120-122.  The records of the Social Security Administration reveal that Herring had limited earnings in the years 1996 through 1997 and 1999 through 2006.  Id.  The sum of Heckelmann's earnings during those 10 years is $129,399.93. Id.

_____

[4]The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). Heckelmann was 33 years of age at the time of the administrative hearing. Tr. 48.

Heckelmann has past relevant employment[5] as (1) a forklift operator which was described by a vocational expert as semi-skilled, medium work, (2) a truck repairmen which was described as skilled, medium work as usually performed in the economy but heavy work as actually performed by Heckelmann, (3) a welder described as skilled, medium work as usually performed and heavy work as actually performed, and (4) a diesel mechanic described as skilled, heavy work.[6] Tr. 84.

---

[5]Past relevant employment in the present case means work performed by Heckelmann during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

[6]The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

At the administrative hearing, Heckelmann claimed that he was disabled because of degenerative disc disease of the lumbar spine, status post-fusion, with lower back pain radiating down both legs to the feet. Tr. 23-25 and 26; Doc. 16, Plaintiff's Brief, p. 2.  The impetus for the alleged disability was a motor vehicle accident which occurred on September 14, 2005, and the failure of spinal surgery that occurred on October 29, 2009. Tr. 58 and 68.  In his application for disability insurance benefits and the present appeal Heckelmann claims that he became

---

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

2 C.F.R. § 404.1567.

disabled on July 18, 2009, because of the pain and other symptoms associated with

his lower back condition.[7] Tr.  21, 118 and 134.

Heckelmann in documents filed with the Social Security Administration and

during the administrative hearing reported totally disabling limitations. Tr. 53-83

and 153-160. The administrative law judge in setting Heckelmann's residual

functional capacity at a limited range of sedentary work found that Heckelmann's

claims were extreme and not credible. Tr. 28.

The relevant time period in this case for assessing whether substantial

evidence supports the administrative law judge's decision is July 18, 2009,

Heckelmann's alleged disability onset date, until December 31, 2010, when his

insured status expired.  Heckelmann was required to establish that he met the

requirements of a listed impairment or suffered from physical functional

impairments on or before December 31, 2010, which prevented him from engaging

in full-time work.

## I.    Standard of Review

When considering a social security appeal, we have plenary review of all legal

issues decided by the Commissioner.  See Poulos v. Commissioner of Social

---

[7]Heckelmann filed a prior application for disability insurance benefits on March 15, 2007. That claim was denied by an administrative law judge on March 12, 2009, and the Appeals Council denied review on April 23, 2010, making the decision of the administrative law judge the final decision of the Commissioner.  An appeal was filed in this court on June 18, 2010, and Judge Muir affirmed the decision of the Commissioner on July 7, 2011. Heckelmann v. Astrue, Civil No. 10-1284, slip op. (M.D.Pa. July 7, 2011)(Doc. 16). In that prior case Heckelmann claimed that he became disabled on September 15, 2005. Id.

Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec.

Admin.,  181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858

(3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant

to 42 U.S.C. § 405(g) is to determine whether those findings are supported by

"substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988);

Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are

supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v.

Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are

supported by substantial evidence, we are bound by those findings, even if we

would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700,

704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive

by a reviewing court if supported by substantial evidence.").

     Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been

described as more than a mere scintilla of evidence but less than a preponderance.

Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial

evidence may be "something less than the weight of the evidence, and the

possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**II.    <u>Sequential Evaluation Process</u>**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether

such work exists in the immediate area in which he lives, or whether a
specific job vacancy exists for him, or whether he would be hired if he
applied for work.  For purposes of the preceding sentence (with respect to
any individual), "work which exists in the national economy" means work
which exists in significant numbers either in the region where such
individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability

insurance and supplemental security income claims.  See 20 C.F.R. §404.1520;

Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in

sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has

an impairment that is severe or a combination of impairments that is severe,[9] (3)

---

[8]If the claimant is engaging in substantial gainful activity, the claimant is not
disabled and the sequential evaluation proceeds no further. Substantial gainful
activity is work that "involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

[9]The determination of whether a claimant has any severe impairments, at
step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §
404.1520(c). If a claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities to perform basic work
activities, the claimant is "not disabled" and the evaluation process ends at step
two. Id.  If a claimant has any severe impairments, the evaluation process
continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable
impairments, severe and non-severe, are considered in the subsequent steps of the
sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An
impairment significantly limits a claimant's physical or mental abilities when its
effect on the claimant's performance of basic work activities is more than slight or
minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push,
pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic
mental or non-exertional abilities include the ability to understand, carry out and
remember simple instructions, and respond appropriately to supervision,
coworkers and work pressures. 20 C.F.R. § 1545(c).

has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## III.   Medical Records

Before we address the administrative law judge's decision and the arguments of counsel, we will review Heckelmann's pertinent medical records and we will

---

[10]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[11]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

commence with records from April, 2008, which predate Heckelmann's alleged

disability onset date.

On April 14, 2008, Heckelmann had an appointment with Alan P. Gillick,

M.D.,  a treating physician, located in Dickson City, Pennsylvania, at which

Heckelmann complained of constant low back pain and intermittent leg pain. Tr.

251.  Heckelmann at that time was taking no medications but had a history of

taking pain medications, receiving chiropractic treatment and physical therapy,

and receiving multiple epidural steroid injections. Id.  Heckelmann was seeking a

surgical solution to his alleged pain. Id.  A physical examination performed by Dr.

Gillick revealed that Heckelmann had "some mild midline paraspinal tenderness

with palpation" and "increased pain with [lumbar] flexion and extension." Id.

However, straight leg raising tests were negative bilaterally;[12] his deep tendon

reflexes were normal (2+ and symmetrical);[13] and he was neurovascularly intact in

both lower extremities. Id.  Dr. Gillick reviewed an MRI of the lumbar spine from

2005 and stated that there was "no evidence of disc herniation, spinal stenosis or

---

[12]The straight leg raise test is done to determine whether a patient with low
back pain has an underlying herniated disc.  The patient, either lying or sitting with
the knee straight, has his or her leg lifted.  The test is positive if pain is produced
between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated
Discs: Straight Leg Raise, SpineUniverse,
http://www.spineuniverse.com/experts/testing-herniated-discs-straight-leg-raise
 (Last accessed May 21, 2014).

[13]"Deep tendon reflexes are normal if they are 1+, 2+ or 3+ unless they are
asymmetric[.]" Deep Tendon Reflexes, neuroexam.com,
http://www.neuroexam.com/neuroexam/content.php?p=31 (Last accessed May 21,
2014).

disc degeneration or other abnormality" and that x-rays performed on April 14,

2008, only revealed that his L4-L5 disc space was slightly diminished compared to

the L3-L4 space but otherwise the x-rays were normal.[14] Id.   Dr. Gillick ordered a

---

[14]The spine (vertebral column) from the head to the tailbone is divided into five regions: the cervical (consisting of 7 vertebrae, C1-C7 in descending order), the thoracic (12 vertebrae, T1-T12 in descending order), the lumbar (5 vertebrae, L1-L5 in descending order), the sacrum (5 fused vertebrae, S1-S5 in descending order) and the coccyx (4 fused vertebrae).

A vertebra consists of several elements, including  the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes.  The vertebral body is the largest part of the vertebra and is somewhat oval shaped. The pedicles are two short processes made of bone that protrude from the back of the vertebral body.  The laminae are two broad plates extending dorsally and medially from the pedicles and fusing to complete the vertebral arch (which is the posterior portion of the vertebra) and encloses the spinal cord.  On an axial view of the vertebra, the transverse processes are two somewhat wing-like structures that extend on both sides of the vertebral body from the point where the laminae join the pedicles. The transverse processes serve for the attachment of ligaments and muscles. The endplates are the top and bottom portions of a vertebral body that come in direct contact with the intervertebral discs.

The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer (annulus fibrosus) and an inner core composed of a gelatin-like substance (nucleus pulposus).

Degenerative disc disease is the wear and tear and breakdown of the intervertebral discs as a person grows older.  It is a process that can result from the dehydration of the discs as well as an injury to the spine. The breakdown of the intervertebral discs can result in discs bulging, protruding or herniating as well as the inner gelatin-like core of the disc extruding outside the outer layer. These conditions sometimes obstruct the openings (foramen) along the spine through which nerve roots exit. This condition is known as neural foraminal narrowing or stenosis. They can also result in a narrowing of the spinal canal or spinal stenosis. Such bulges, protrusions and herniations if they contact nerve tissue can cause pain. Dehydration of the disc can result in a decrease in the height of the discs.

new MRI to see if anything had changed since the time the MRI was taken in 2005. Id.  Dr. Gillick did not initiate any treatment. Id.

The MRI of the lumbar spine was performed on April 17, 2008, and revealed mild multilevel degenerative changes "most conspicuous involving the disk at L4-5 the facet joints at L3-4 and L4-5." Tr. 238.   There was "[n]o compressive spondylopathy or discopathy."[15] Id.

Dr. Gillick had a follow-up appointment with Heckelmann on April 28, 2008, at which time Dr. Gillick reviewed the MRI with Heckelmann. Tr. 253.  Dr. Gillick noted that Heckelmann was "intent on having surgery . . . because he has had a lot of treatment when he lived in New Jersey [and his pain] now [] is predominantly back pain but he does have some leg radiation." Id.  A physical examination revealed that Heckelmann had "tenderness in the low lumbar spine" and "increased discomfort with movements, including flexion and extension and rotation."  Id.  Straight leg raising tests were reported to cause increased back pain without specifically indicating that the tests were abnormal. Id.  Heckelmann had

---

Degenerative joint disease (or osteoarthritis) is a breakdown of the cartilage between joints.  In the spine there are facet joints which are in the back of the spine and act like hinges. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. These joints are covered with cartilage and the wear and tear of these joint is known as facet arthropathy (arthritis). This wear and tear of the facet joints result in loss of cartilage and can cause pain.

[15]Spondylopathy refers to disease of the vertebrae while discopathy refers to disease of the intervertebral discs.  When there is abnormality in either the vertebrae or discs, tissues, including nerves, can be compressed.

normal pulses, reflexes, motor strength and sensation in the lower extremities. Id.
Dr. Gillick stated that the MRI revealed degeneration at the L4-5 and L5-S1 levels
of the lumbar spine but that above those levels he had normal healthy discs. Id. Dr.
Gillick noted that Heckelmann was potentially a candidate for a two level fusion but
suggested that Heckelmann first have a discogram performed.[16] Id.

On December 9, 2008, Heckelmann had a provocative lumbar discography
performed at the Northeast Surgery Center by Joseph Chun, D.O. Tr. 254-256. This
procedure revealed that Heckelmann had positive painful discs at the L4-L5 and
L5-S1 levels of the lumbosacral spine. Tr. 256. It was stated that "[s]evere and
partially concordant low back pain was provoked which was reproducible" and that
at both levels there was a "posterior tear to the outer annulus." Id. A post-
discogram CT scan performed on the same day confirmed abnormalities at the L4-
L5 and L5-S1 levels, specifically the annular tears, and mild to moderate right
foraminal stenosis at the L4-L5 level.[17] Tr. 300.

---

[16]Discography or a discogram is an invasive pain provocative procedure to
confirm which discs are responsible for an individual's pain. Needles are inserted
and pressurized fluid injected into the suspected discs and the pain response
recorded. The procedure is fairly definitive and can be used to detect exaggerated
symptoms. If the pain caused by the injection procedure is the same as the disc
pain experienced by the patient, then it is considered a positive, or concordant,
discogram.

[17]The CT scan revealed that contrast material which was injected into the
nucleus pulposus at the L4-L5 and L5-S1 levels did migrate into the annulus at
those levels suggesting annular tears.

On December 19, 2008, Heckelmann had a follow-up appointment with Dr. Gillick at which Heckelmann continued to complain of low back pain. Tr. 259. Physical examination findings remained unchanged. Id.  In commenting on the discogram, Dr. Gillick noted that it revealed "concordant pain that was quite severe."[18]  Id.  Surgical options were discussed at this appointment. Id. In the concluding sentence of the report of this appointment, Dr. Gillick stated "[a]fter answering many questions, I believe he needs some additional thinking time before making any type of surgical decision." Id.

On March 16, 2009, Heckelmann underwent an independent medical examination performed by Robert Dennis, M.D., located in Neptune, New Jersey, in connection with the legal proceedings relating to the 2005 motor vehicle accident. Tr. 344-368.  Dr. Dennis after performing the examination concluded that Heckelmann could not return to his work as a welder but did not rule out "very mild and sedentary work." Tr. 367.  Dr. Dennis did not specify any work-related functional abilities, such as Heckelmann's capacity to lift and carry items or to sit, stand and walk during an 8-hour workday. Tr. 344-368.   On March 31, 2009, Dr. Gillick also provided a letter to Heckelmann's attorney in relation to the legal proceedings surrounding the motor vehicle accident. Tr. 370-371.  This letter reveals that Dr. Gillick did not rule out "extremely sedentary work" but only that "even with surgical intervention it is unlikely that he will return completely to his

---

[18]The discogram performed on Heckelmann only revealed partially concordant low back pain.

pre-injury status." Id.   Dr. Gillick also did not specify any work-related functional abilities, such as Heckelmann's capacity to lift and carry items or to sit, stand and walk during an 8-hour workday. Id.

On August 31, 2009, Heckelmann had an appointment with Dr. Gillick at which Heckelmann continued to complain of severe low back pain. Tr. 264.  The physical examination findings remained the same and it was decided to proceed with surgery, a posterior instrumented fusion. Id.  Dr. Gillick performed that surgery (a decompression right S1 root, instrumented L4 to sacrum fusion using right posterior iliac crest graft) on October 29, 2009. Tr. 244.  Heckelmann tolerated the procedure well. Tr. 245.

At a follow-up appointment on December 21, 2009, Dr. Gillick noted that Heckelmann seemed to be doing well. Tr. 263.  Heckelmann reported some tenderness in the iliac crest graft area but minimal other discomfort. Id.  He had no significant pain with flexion and extension movements; he had negative straight leg raising tests; and he had normal motor strength, sensation, reflexes and pulses in the lower extremities. Id.   X-rays revealed intact instrumentation, good alignment and some early evidence of consolidating lateral fusion mass. Id.  Heckelmann was advised to continue wearing his brace full-time. Id.

At a follow-up appointment with Dr. Gillick on February 1, 2010, a physical examination of Heckelmann revealed a healed incision with no swelling or redness; Heckelmann had some tenderness and pain with flexion and extension movements within the restrictions of the brace; his straight leg raising tests were negative; and

16

he had normal motor strength, sensation, reflexes and pulses in the lower extremities. Tr. 262.  X-rays were noted to "look quite good" and revealed intact instrumentation and anatomic alignment. Id.

On March 9, 2010, Paul A. LaNunziata, Ed.D., a psychologist, reviewed Heckelmann's medical and school  records on behalf of the Bureau of Disability Determination and concluded that Heckelmann suffered from a learning disorder but that it was a non-severe impairment. Tr. 266-267 and 278.

On April 5, 2010, Dr. Gillick after examining Heckelmann reported that although  Heckelmann still has pain issues "[a]ll in all" he was "doing relatively well." tr. 307.  Dr. Gillick noted that both Heckelmann and his wife reported that "some days [he] is virtually pain free and other days where he is just not good." Id. A physical examination revealed that Heckelmann's incision was well healed with no redness or swelling; he had minimal discomfort with flexion and extension movements within the restrictions of the brace; he had negative straight leg raising tests; and he had normal motor strength, sensation, reflexes and pulses in the lower extremities. Id.  X-rays revealed intact instrumentation, good alignment and good healing. Id.  Dr. Gillick ordered a repeat MRI. Id.

The MRI of Heckelmann's lumbar spine was performed on April 13, 2010, and revealed "good positioning" of the metallic instrumentation and "well maintained" vertebral body height. Tr. 304.  It also revealed at the L4-L5 level disc dessication (lost of water content), mild to moderate disc space narrowing, no

significant disc protrusion or spondylosis[19] and normal size (caliber) of the spinal

canal and foraminal openings, and at the L5-S1 level disc space narrowing, no disc

protrusion or spondylosis, normal size of the spinal canal and foraminal openings,

and no significant arthritic changes of the facet joints. Id.  The conclusion was that

the MRI revealed a "[s]atisfactory post surgical appearance of the lumbar spine."

Tr. 305.

On April 26, 2010, Heckelmann was examined on one occasion by Scott

Prince, D.O., on behalf of the Bureau of Disability Determination. Tr. 286-288 and

290-295. Dr. Prince reported that although Heckelmann moved slowly he was in no

acute distress and was  awake, alert and oriented and his mental status was

appropriate. Tr. 287.  Heckelmann's eye contact, answering of questions and

interactions during the examination was appropriate. Id.  The objective physical

examination findings were  normal other than the "[s]traight leg raising test [was]

positive on the left side seated, positive on the right side at 20 degrees and left side

at 45 degrees;" he had an "unsteady and shuffling" gait; he was unable to walk on

his heels and toes;  and his strength in the left lower extremity was 4/5. Tr. 288.

Heckelmann reported that "he gets pain in his midlumbar area" and it was

observed by Dr. Prince that "[w]hen going from a seated to supine [position,

Heckelmann] laid on the right side first and then rolled on to his back." Id.

---

[19]Degeneration of the vertebrae and intervertebral discs is medically referred
to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the
spine as a narrowing of the normal "disc space" between the adjacent vertebrae.
The term is frequently used to describe osteoarthritis of the spine.

Heckelmann's fine and dexterous movements were noted to be normal. Id.   Dr.

Prince concluded that Heckelmann suffered from degenerative disc disease of the

lumbar spine, status post surgeries and a history of depression. Id.  With respect to

work-related functional abilities, Dr. Prince concluded that Heckelmann could

frequently lift and carry 10 pounds and occasionally 25 pounds; he could

cumulatively stand and walk 1 to 2 hours during an 8-hour workday; he could sit a

total of 6 hours during an 8-hour workday; he had no pushing and pulling

limitations other than the weight limits set for lifting and carrying; he could

occasionally bend, balance and climb but never kneel, stoop or crouch; and he had

no manipulative or sensory limitations such as reaching, handling, fingering, seeing

and smelling, or environmental limitations. Tr. 290-291.  Dr. Prince also assessed

the range of motion of Heckelmann's shoulders, elbows, wrists, hands  hips, cervical

spine and lumbar spine. Tr. 292-295.   Heckelmann's range of motion was

completely normal other than lumbar flexion (bending forward)  was limited to 75

degrees (normal being 0 to 90 degrees) and bilateral knee flexion which was limited

to 100 degrees (normal being 0 to 150 degrees). Id.   An x-ray of Heckelmann's

lumbar spine ordered by Dr. Prince which was performed on April 28, 2010,

revealed postsurgical changes and the metallic instrumentation; normal vertebral

height, disc spaces and alignment; no acute fracture, subluxation (dislocation) or

spondylolisthesis;[20] and symmetrically patent sacroiliac joints. Tr. 289.

---

[20]A spondylolisthesis is a forward slip of one vertebra relative to another. See
Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012).

On May 10, 2010, Heckelmann had an appointment with Dr. Gillick at which time the MRI of April 13, 2010, was reviewed and a physical examination performed. Tr. 306 The physical examination was normal. Id.  Heckelmann had a well healed incision; he had no tenderness, redness or swelling; he had no pain with flexion and extension of the lumbar spine; his straight leg raising tests were negative; and he had normal motor strength, sensation reflexes, and pulses in the lower extremities. Id.  Dr. Gillick stated that the MRI revealed "no evidence of any type of nerve irritation or compression" and he recommended pool therapy for Heckelmann 's complaints of ongoing back discomfort. Id.

On May 24, 2010, Minda Bermudez, M.D., reviewed on behalf of the Bureau of Disability Determination, Heckelmann's medical records and Dr. Prince's assessment of Heckelmann's functional capacity and concluded that Heckelmann could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; he could stand and/or walk 2 hours and sit about 6 hours in an 8-hour workday; he had no pushing or pulling limitations other than as shown for lifting and carrying; he was limited to occasional climbing of ramps and stairs and never climbing ladders; he was limited to occasional balancing, stooping, kneeling, crouching, and crawling; he had no manipulative or visual limitations; and he had to avoid concentrated exposure to extreme cold and hazards, such as moving machinery. Tr. 319-321.

**IV.** __Discussion__

The administrative law judge at step one of the sequential evaluation process found that Heckelmann did not engage in substantial gainful work activity during the period from his alleged onset date of July 18, 2009, through his date last insured of December 31, 2010. Tr. 23.

At step two of the sequential evaluation process, the administrative law judge found that Heckelmann through the date last insured had the following severe impairment: "degenerative disc disease of the lumbar spine, status-post fusion[.]" Id.  The administrative law judge found that Heckelmann had a medically determinable impairment of cervical degenerative disc disease but that it was a non-severe impairment. Id.   The administrative law judge found that Heckelmann's alleged depression was not a medically determinable impairment because Dr. LaNunziata stated that Heckelmann had not been diagnosed with depression or received treatment for it. Tr. 24.  Finally, the administrative law judge concluded that Heckelmann had a medically determinable learning disorder but that it was a non-severe impairment as found by Dr. LaNunziata. Id.

At step three of the sequential evaluation process the administrative law judge found that Heckelmann's impairments did not individually or in combination meet or equal a listed impairment. Tr. 86-87.

In addressing step four of the sequential evaluation process, the administrative law judge found that Heckelmann could not perform his past semi-skilled to skilled,  medium to heavy work but that he could perform a limited range

of unskilled, sedentary  work. Tr. 25 and 28.  Specifically, the administrative law

judge found that Heckelmann could perform sedentary work as defined by the

regulations except

> he would require a sit/stand option to be exercised at the claimant's
> discretion, with the proviso that it would not take him off-task more than 10
> percent of the time.  The claimant can utilize his upper extremities without
> restrictions, but reaching overhead should not be any more than occasional.
> The claimant should avoid climbing ladders, scaffolds or ropes, except for
> emergencies, and should not use ramps or stairs except occasionally. The
> claimant would be limited in terms of postural activities, such as balancing,
> stooping and crouching occasionally, and kneeling and crawling in the
> emergent range. The claimant can engage in activities that would be more of
> a moderate production pace, not a high volume, high intensity work-pace.
> The claimant should not work at unprotected heights, at all.  The claimant
> should not work around dangerous, moving machinery, particularly moving
> automobiles.

Tr. 25.  In setting the residual functional capacity, the administrative law judge

reviewed the medical records and considered several other items including the

treating physicians' medical notes and the reports from the consultative examiners.

Tr. 26-28.  The administrative law judge found that Heckelmann's statements about

his functional limitations were not credible to the extent they were inconsistent

with the above residual functional capacity. Tr. 26.  The administrative law judge

relied on the opinion of Dr. Bermudez but gave Heckelmann the benefit of the

doubt and reduced his capacity for lifting and carrying to the sedentary work level

instead of the light work capacity found by Dr. Bermudez.  Tr. 27. Dr. Bermudez's

assessment was completely supportive of the residual functional capacity set by the

administrative law judge. Id.

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a vocational expert found that Heckelmann had the ability to perform work as a visual inspector, bench assembler and surveillance system monitor, and that there were a significant number of such jobs in the local and state economies. Tr. 29. Consequently, the administrative law judge found that Heckelmann was not disabled. Tr. 30.

The administrative record in this case is 377 pages in length, primarily consisting of medical and vocational records. The administrative law judge did an adequate job of reviewing Heckelmann's medical history and vocational background in his decision. Tr. 21-30.

Heckelmann argues that the administrative law judge erred by (1) failing to find that he met Listing 1.04A relating to disorders of the spine, (2) failing to give controlling weight to the opinion of Dr. Dennis, (3) improperly discounting the opinion of Dr. Prince who stated that Heckelmann should never kneel, stoop or crouch, and (4) improperly discounting his subjective complaints of pain. We have thoroughly reviewed the record in this case and find no merit in Heckelmann's arguments.

Heckelmann's first argument is premised on the contention that he met the requirements of Listing 1.04A. Before we address the requirements of that listing we will mention some basic principles set forth in case law and the regulations of the Social Security Administration. If Heckelmann's severe impairment met or equaled a listed impairment, he would have been considered disabled per se and

awarded disability benefits.  However, a claimant has the burden of proving that his or her severe impairment meets or equals a listed impairment.  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990); 20 C.F.R. § 1520(d) and § 416.920(d).  To do this a claimant must show that all of the criteria for a listing are met.  <u>Id.</u>  An impairment that meets or equals only some of the criteria for a listed impairment is not sufficient. <u>Id.</u>

Furthermore, the Commissioner's Listings contemplate that findings satisfying the required criteria will be consistently documented over a period of time, not just on isolated examinations. 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.00D ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); <u>id.</u> §1.00H(1)("Musculoskeletal impairments frequently improve with time or respond to treatment; [t]herefore, a longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment . . . .").

The determination of whether a claimant meets or equals a listing is a medical one. The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512©. Consequently, a claimant must present medical evidence or opinion that his or her impairment meets or equals a listing.

To satisfy Listing 1.04A, Heckelmann had the burden of proving that he had a disorder of the spine, (e.g.,herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture) resulting in compromise of a nerve root or the spinal cord, <u>with evidence of nerve root compression</u> characterized by neuro-anatomic distribution of pain; limitation of motion of the spine; motor loss (atrophy with associated muscle weakness or muscle weakness); accompanied by <u>sensory or reflex loss</u>; and, if there is involvement of the lower back, with <u>positive straight-leg raising tests in the sitting and supine position</u>.  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04 (2011)(emphasis added).

Heckelmann has proffered no medical opinion, nor has he marshaled the evidence in the record, to support his contention that his condition met or equaled the requirements of a listed impairment.  The record is devoid of  positive straight-leg raising tests during the relevant time period in the sitting and supine position.  Furthermore, Heckelmann does not identify, and the record does not appear to contain, an express finding of nerve root compression.   Furthermore, Heckelmann's motor strength, sensation, reflexes and pulses were consistently normal.

No treating or examining physician offered an opinion as to how Heckelmann's impairments limited his functional capabilities or ability to work and

the bare medical records do not support Heckelmann's claim of total disability, including his claim that he met Listing 1.04A.[21]

No physician who treated Heckelmann indicated that Heckelmann was totally disabled for the requisite 12 month period required by the statute.[22] However, Dr. Bermudez, a state agency physician, in May, 2010, reviewed Heckelmann's medical records and concluded that Heckelmann had the functional ability to engage in a range of sedentary work.  The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

The administrative law judge did not have to accept the opinions of either Dr. Dennis or Dr. Prince.  See 20 C.F.R. § 404.1527(c)(2) and (d)(1).  Dr. Dennis's opinion was rendered before Heckelmann's alleged disability onset date and he did not opine that Heckelmann was totally disabled for the requisite continuous 12 month

---

[21]Listing 1.04A requires "compromise of a nerve root. . . or spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight leg raising (sitting and supine)."

[22]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

period.  Also, Dr. Dennis was not a treating physician but a consultative examiner in conjunction with Heckelmann's civil action relating to the 2005 motor vehicle accident.  As for the opinion of Dr. Prince, he was not a treating physician and the administrative law judge did not have to place any particular weight on his opinion in contrast to the opinion of Dr. Bermudez.

Under the circumstances presented, it was clearly appropriate for the administrative law judge to conclude, based on Dr. Bermudez's opinion, that Heckelmann had the physical functional ability to engage in a limited range of full-time sedentary work.

The administrative law judge found that Heckelmann's statements about his functional limitations were not credible to the extent they were inconsistent with the assessed residual functional capacity.   When there is a paucity of objective medical facts supporting a claimant's alleged symptoms, the administrative law judge has to consider the claimant's credibility.  To the extent that Heckelmann argues that the administrative law judge did not properly consider his credibility, the administrative law judge was not required to accept Heckelmann's claims regarding his physical impairments, particularly with respect to the relevant time period.  See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the

administrative law judge] is charged with the duty of observing a witness's

demeanor . . . ."  <u>Walters v. Commissioner of Social Sec.</u>, 127 f.3d 525, 531 (6th Cir.

1997); <u>see</u> <u>also</u> <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799, 801 (10th

Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned

to observe and assess the witness credibility.").  Because the administrative law

judge observed and heard Heckelmann testify, the administrative law judge is best

suited to assess his credibility.

We are satisfied that the administrative law judge appropriately took into

account all of Heckelmann's physical limitations in the residual functional capacity

assessment.  Our review of the administrative record reveals that the decision of the

Commissioner is supported by substantial evidence.  Therefore, the court will

affirm the decision of the Commissioner.

An appropriate order will be entered.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      May 27, 2014